UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---------------------------------------------------------x

David Pope,

    Plaintiff,

v.

Dream Yacht Americas, Inc.,

    Defendant,

Truist Bank Inc. successor to
Branch Banking and Trust ("BB&T")

    Garnishee.

---------------------------------------------------------x

**Civil Action – In Admiralty**

**CASE NO: 21-_____**

# VERIFIED COMPLAINT WITH REQUEST FOR ISSUE
# OF PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT

David Pope ("Mr. Pope") brings this action against Dream Yacht Americas, Inc. ("Dream Yacht") *quasi in rem* pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims, requesting the issue of a writ of maritime attachment and garnishment including against Garnishee and states as follows:

## Jurisdiction and Venue

1. This is an action within this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and is an admiralty or maritime claim within Fed. R. Civ. P. 9(h) in that it involves breach of a maritime contract, namely, breach by defendant of a charter party for a boat, as detailed herein.

2. Venue is proper in this District because the Defendant cannot be found in this District within the meaning of Supplemental Rule B and the Garnishee is located, can be found, and/or can be served with process in this District.

3. Venue is also proper in this District because the Garnishee can be served in this District by its resident agent and because Garnishee holds Defendant's property, that property is or soon will be in this District because it is or will be held or controlled by the Garnishee

4. Defendant cannot be found in this District within the meaning of Supplemental Rule B.

### The Parties

5. Mr. Pope an individual resident in Buford, Georgia in this District.

6. Dream Yacht is a Maryland corporation located in Annapolis, Maryland which charters boats (yachts) for family vacations, including for a family vacation in June, 2021 to Mr. Pope.

7. Garnishee is an entity with offices or agents located in this District which, on information and belief as detailed below, holds accounts which are the property of and/or owing to Dream Yacht.

### Facts

8. On May 5, 2021, Mr. Pope entered into a Booking Confirmation confirming the charter from Dream Yacht a (Premier) Bali 4.3 - 4 + 1 cab. - 8 + 1

berths yacht, for delivery check-in Saturday, June 19, 2021 and return and check-out Tuesday, June 29, 2021, at St. Thomas, U.S. Virgin Islands, Compass Point Marina. The charter price was $11,602.00. Under the charter, confirmed by its Booking Confirmation, Dream Yacht promised that it would deliver the Boat "in good working order."

9. Mr. Pope, his family, and one other family, traveled from the continental U.S. to St. Thomas, to commence the charter as agreed with Dream Yacht. Consequently, on Saturday, June 19, 2021, Mr. Pope's family and the one other family met at Compass Point Marina in the U.S. Virgin Islands as directed by Dream Yacht, to board the chartered yacht, a Dream Yacht Charter Bali 4.3 sailing catamaran named TROPICAL D-TOUR (the "Boat"), a U.S. flagged, Coast Guard documented vessel.

10. On immediate inspection of the Boat, Mr. Pope and the other family members and friends with him identified numerous issues. The Boat cushions were covered with mold and mildew and looked like they hadn't been cleaned since the Boat entered Dream Yacht's fleet in 2018-2019. Little effort was made to hose down the decks to remove the filth left behind by the previous charterer. There was dirt, food, and hair trapped in the nooks and crannies of the aft and salon decks. Dirt, food, and hair from previous charters had not been hosed off the deck. The hulls were badly in need of a cleaning and it appeared that they had not been cleaned in a very long time.

11. When entering into the charter with Dream Yacht, Mr. Pope also prepaid Dream Yacht for two paddleboards and a kayak. On June 19, 2021, however, when Mr. Pope attempted to pick up this prepaid equipment, Dream Yacht personnel or agents told him that a kayak was not available.

12. The air conditioning in one cabin of the Boat was not working. Dream Yacht did recharge the refrigerant after Mr. Pope reported the problem, assuring him that there would be no further issue. Mr. Pope later learned that Dream Yacht knew well before they boarded that the air conditioning was broken, and that recharging the refrigerant would not fix the problem; Dream Yacht made no effort to make a permanent repair before the charter.

13. Because of Dream Yacht's delays and the problems with the Boat, Mr. Pope, his family and the other family spent the first night on the Boat at the Dream Yacht dock at St. Thomas. Finally, at about 1:00 p.m. on June 20, 2021, a Dream Yacht employee appeared, explaining that that the man who normally gave briefings did not show up to work that day. The Dream Yacht employee proceeded with a 10-minute briefing consisting mainly of a review of anchorages around the island. No mention was made of the Boat's freshwater tank switchover valve, or the black water through hull valve locations, or the operation of several of the onboard systems.

14. It appeared from the Dream Yacht employee's demeanor and the content of the briefing that he did not want to spend much time providing a

thorough briefing and just wanted to finish and move on, and for Mr. Pope, his family and the other family to go away.  With the delayed briefing, such as it was, Mr. Pope, and the others with him, were only able to leave the dock very late on the second day of the charter, with a half day ahead of sailing to their first location.

15. The first night was spent on a mooring ball at Christmas Cove mooring, St. Thomas.  That night Mr. Pope discovered that Dream Yacht had failed to repair the air conditioning system. The temperature in the cabin hovered at 83 degrees Fahrenheit even with the ports and hatches open to promote airflow. Mr. Pope and those with him on the Boat tried to sleep on deck cushions and in the salon, but were either rained on every night or eaten alive by mosquitoes.  They did not have a pleasant sleep for the remainder of the trip because the failure of the Boat's air conditioning system.

16. The next day, Mr. Pope called the number which Dream Yacht had given him for mechanical repairs, to report the air conditioning issue.   The agent or employee of Dream Yacht promised that Dream Yacht would take care of the problem, but no one arrived to do so and Dream Yacht never followed up its promise with a call back or otherwise.

17. Over the next days, Mr. Pope and those aboard with him discovered other onboard systems that were not working.   The Boat's windlass was not attached to the deck.  It dangerously jumped inches off the deck and twisted violently each time it was activated, causing the chain to jump off the gypsy and

freefall over the bow when the anchor was dropped. Because the windlass was unusable, Mr. Pope could not anchor the Boat. There also was no snubber line to hold the anchor in place and secure. Numerous broken cushion tiedowns also caused cushions to fly off the Boat while underway. The Boat had two leaking windows which had not been repaired, allowing water to enter through the window and drip down onto the starboard hull floor and create a large puddle. There also was a major tear in flybridge bimini material, allowing in rainwater. Mr. Pope continued to make telephone calls to Dream Yacht, which assured Mr. Pope that it would repair the problems "soon."

18. The propane connected to the Boat's cooking systems soon ran out. Mr. Pope learned that Dream Yacht had failed to properly check the backup tank; the backup tank and hose fittings were incompatible. Mr. Pope and those with him aboard the boat, because of the lack of propane, were unable to cook any of their provisions. Mr. Pope made more telephone calls to Dream Yacht, with no response from Dream Yacht.

19. Mr. Pope and those with him had no way to cook raw meat and many of their other provisions, so to eat they had to visit ports with restaurants. That, however, required anchoring, which was not possible because the Boat's windlass was broken. Mr. Pope and those with him were reduced to living in an unpleasant survival mode. It was very stressful especially for the children.

20. Mr. Pope learned later that evening that the freshwater maker was not working and after carefully monitoring water levels that night confirmed the next day that the freshwater maker, too, was defective. Dream Yacht did not respond to telephone calls about this further, serious problem, either. Mr. Pope therefore had to divert the Boat from the sailing plans, to go to Red Hook marina dock, St. Thomas, to buy freshwater.

21. The inoperable windlass and anchoring system restricted where the Boat could go and moor, and the Boat only could be moored where mooring balls were available. Mr. Pope, his family, and the other family members with him had to ration food and fresh water, while trying to figure out where they could dock to get fresh water and restaurant meals or no-cook grocery store food to feed the children with them.

22. The Boat also was supposed to have a working dinghy, however, the dinghy motor was defective, very difficult to start but once started and warm, it would not maintain an idle. It kept dying out unless gas was applied constantly. This greatly increased the challenge of obtaining food from limited shore locations.

23. Mr. Pope had previously arranged for his family, and the other family with them, to do some SCUBA diving with a St. Thomas-based dive shop. With the broken windlass Mr. Pope was not able to sail to their location, anchor the Boat, and board the dive boat. Mr. Pope had to arrange for the dive contractor to

rendezvous with the Boat while on a mooring ball in the St. John National Park. This incurred an additional cost.

24. When Mr. Pope was able to speak with a human acting for Dream Yacht about the problems with the Boat, he spoke both with the USVI Dream Yacht Charter mechanical repair hotline, as well as the USVI Dream Yacht Charter marina office. Most of the calls that made it through to a human were handled by Herve Burnel (Dream Yacht's base manager). There were more than 40 calls made over a period of 8 days. Many of those calls were never answered by a human. Days came and went, but no one from Dream Yacht Charters appeared despite numerous calls requesting help.

25. Finally, at 6:00PM on day nine of the charter, the last day, a boat arrived with a tank of propane. The technicians said that they couldn't fix the windlass because it was too damaged to fix at that time. They said that they couldn't fix the air conditioning. They also told Mr. Pope that the broken air conditioning was a known issue reported by a previous charterer. They couldn't fix the freshwater maker because it was too complicated for them. They also confirmed that the dinghy badly needed maintenance.

26. Dream Yacht's failure to deliver the Boat in the operating condition promised and inherent in the charter, and failure to fix the repeatedly reported problems with the Boat, known in advance to Dream Yacht, ruined a much anticipated vacation for two families.

27. Mr. Pope's, and his family's, damages include but are not limited to the cost of the charter, lost opportunities for the planned vacation including additional charges for the contracted diving excursion and restaurant meals, airfare and lodging, all as detailed below.

## Count I – Breach of Maritime Contract

28. Mr. Pope incorporates the above paragraphs as if fully set forth herein.

29. Dream Yacht breached its maritime contract with Mr. Pope as set out above. Despite repeated demand, Mr. Pope remains unpaid for his damages.

30. Mr. Pope therefore demands judgment, as set out more fully below.

## Count II: Maritime Attachment and Garnishment (Rule B)

31. Mr. Pope incorporates the above paragraphs as if specifically set forth herein.

32. Mr. Pope seeks issue of process of maritime attachment so that he may obtain payment for the amounts due to him in damages by Dream Yacht.

33. No security for Mr. Pope's claims has been posted by Dream Yacht or anyone acting on its behalf to date.

34. Dream Yacht cannot be found within this District within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction consisting of cash, funds, freight, hire,

and/or credits in the hands of garnishees in this District, including but not limited to those named Garnishee herein.

### Prayer for Relief

WHEREFORE, Mr. Pope prays:

A. That in response to Count I, process of maritime attachment be issued to garnish and attach property of Dream Yacht in the amount of at least **$41,200** detailed as follows:

| | |
|---|---|
| $ 5,351 | Airfare |
| $ 11,602 | Charter Payments |
| $ 9,280 | PTO Wasted |
| $ 4,967 | Imposed Expenses (restaurant meals, additional charges, etc.) |
| **$ 31,200** | |

and an additional $10,000 for interest and costs over an estimated two year term of litigation and potential appeal.

B. That in response to Count II, since Dream Yacht cannot be found within this District pursuant to Supplemental Rule B, this Court issue an Order directing the Clerk to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Dream Yacht's tangible or intangible property or any other funds held by any garnishee, up to the amount of at least the amount demanded herein to secure Mr. Pope's claims, and that all persons claiming any interest in the same be Dream Yacht to appear and, pursuant to Supplemental Rule B, answer the matters alleged in the Verified Complaint;

C. That as provided in Supplemental Rule B, that such person over 18 years of age be appointed as moved for herein pursuant to Supplemental Rule B and Fed. R. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action; and

D. That this Court award Mr. Pope such other and further relief that this Court deems just and proper.

Dated: September 22, 2021.

                        Respectfully submitted,

                        By: /s/ J. Stephen Simms
                        J. Stephen Simms
                        Simms Showers LLP
                        jssimms@simmsshowers.com
                        Telephone: (443) 290-8704
                        201 International Circle
                        Baltimore, Maryland 21030

                        *PRO HAC VICE* ATTORNEYS FOR
                        PLAINTIFF (to be filed)

/s/ Mathew G. Nasrallah
Mathew G. Nasrallah
Georgia Bar No. 535200
Robertson, Bodoh & Nasrallah, LLP
990 Cobb Parkway North
Suite 205A
Marietta, GA 30062
770-424-1234 (telephone)
770-424-2345 (facsimile)
nasrallah@rbnlaw.com

LOCAL ATTORNEY FOR PLAINTIFF

# VERIFICATION

David Pope certifies as follows:

I am over 18 years old and competent to make this Verification. The facts alleged in the foregoing complaint are true and correct to the best of my personal knowledge and information.

> Pursuant to 28 U.S.C. § 1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

> Executed on September 21, 2021.

_____
David Pope

J. Stephen Simms certifies as follows:

I am a principal of Simms Showers LLP, counsel to Plaintiff.

I further that, pursuant to Supplemental Rule B, I caused a search to be made of electronic records and Directory Assistance for addresses and telephone numbers of Defendant in this District. There is no record of any general or resident agent authorized to accept service of process for Defendant in this District.

> Pursuant to 28 U.S.C. § 1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

> Executed on September 22, 2021.

/s/ J. Stephen Simms
J. Stephen Simms